# EXHIBIT A

STATE OF NORTH CAROLINA

COUNTY OF GASTON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS- 1929

GASTONIA 1228 INVESTMENTS, LLC, )
)
                Plaintiff, )
)
vs. )
)
HB GASTONIA, LLC; VICTOR P. )
BALESTRA; NATHAN S. WARD; )
RICHARD SCHLANGER; JAMES W. )
HARPEL; and SHAUN L. McGRUDER, )
)
            Defendants. )
_____ )

**VERIFIED COMPLAINT**

NOW COMES Plaintiff, Gastonia 1228 Investments, LLC, and hereby alleges and says as follows:

**PARTIES AND JURISDICTION**

1.     Plaintiff Gastonia 1228 Investments, LLC ("Gastonia 1228" or "Plaintiff") is a corporation duly authorized to conduct business in North Carolina and has at all relevant times conducted business in Gaston County, North Carolina.

2.     Upon information and belief, Defendant HB Gastonia, LLC ("HB Gastonia") was a foreign limited liability company that was duly authorized to conduct business and did conduct business in North Carolina at all relevant times hereto. On April 4, 2012, the North Carolina Secretary of State filed a Certificate of Revocation of Certificate of Authority based upon HB Gastonia's failure to timely file its annual report.

3.     Upon information and belief, Defendant Victor P. Balestra ("Balestra") is a citizen and resident of Miami-Dade County, Florida. During the relevant time period hereto, Balestra signed contracts regarding real property in North Carolina.

4.     Upon information and belief, Defendant Nathan S. Ward ("Ward") is a citizen and resident of Palm Beach County, Florida. During the relevant time period hereto, Ward signed contracts regarding real property in North Carolina.

5.     Upon information and belief, Defendant Richard Schlanger ("Schlanger") is a citizen and resident of Palm Beach County, Florida. During the relevant time period hereto, Schlanger signed contracts regarding real property in North Carolina.

6.     Upon information and belief, Defendant James W. Harpel ("Harpel") is a citizen and resident of Suffolk County, New York. During the relevant time period hereto, Harpel signed contracts regarding real property in North Carolina.

7.     Upon information and belief, Defendant Shaun L. McGruder ("McGruder") is a citizen and resident of Palm Beach County, Florida. During the relevant time period hereto, McGruder signed contracts regarding real property in North Carolina.

8.     HB Gastonia, Balestra, Ward, Schlanger, Harpel, and McGruder are collectively known as the "Defendants." Balestra, Ward, Schlanger, Harpel, and McGruder are collectively known as the "Indemnitors."

9.     The real property that is the subject of this lawsuit is located in Gastonia, Gaston County, North Carolina at 1228 Isley Drive ("Property").

10.     Jurisdiction and venue are proper in this Court.

## FACTUAL BACKGROUND

11.     Paragraphs 1 through 10 above are realleged and incorporated herein by reference.

12.     On October 23, 2006, Defendant HB Gastonia executed a Promissory Note ("Promissory Note") payable to lender PNC Bank, National Association ("PNC Bank"). This

Promissory Note is secured by a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated October 23, 2006 and recorded on October 25, 2006 in Book 4265, Page 1592 of the Office of the Register of Deeds for Gaston County, North Carolina ("Deed of Trust"). True and accurate copy of the Promissory Note is attached hereto as **Exhibit A** and is incorporated herein by reference.

13.    The Promissory Note contains an Exculpation Clause in Paragraph 12 ("Non-Recourse Exceptions"), in which "Borrower" refers to HB Gastonia and "Lender" refers to PNC Bank, now Gastonia 1228:

> Subject to the provisions of this Section, Borrower's liability under this Note, the Security Instrument or the Other Security Documents shall only extend to the Mortgaged Property and other collateral given to secure the Debt, and Lender shall not enforce such liability against any other assets, property or funds of Borrower; provided, however, the foregoing shall not:
>
>> (a)    impair the right of Lender to bring suit and obtain personal, recourse judgments against any person or entity (including Borrower) relating to any losses (including attorney's fees and court costs) sustained by Lender in connection with any fraud, intentional misrepresentation, waste, or misappropriation of tenant security deposits or rents collected more than one (1) month in advance by Borrower; . . .
>>
>> (c)    affect the validity or enforceability of, or impair the right of Lender to bring suit and obtain personal, recourse judgments against any person or entity (including Borrower) to enforce any guaranty, indemnity or release of liability made by such person or entity (whether made in this Note, the Security Instrument, any of the Other Security Documents or in any other separate agreement) . . .

14.    The Deed of Trust encumbers the Property as well as all "buildings, structures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now

or hereafter located thereon at 1228 Isley Drive, Gastonia, North Carolina." (Paragraph (a) of Recitals).

15.     As a condition of extending a loan to HB Gastonia, PNC Bank required that a Non-Recourse Indemnification Agreement be executed ("Indemnification Agreement").

16.     On October 23, 2006, Balestra, Ward, Schlanger, Harpel, and McGruder executed the Indemnification Agreement in their individual capacities. A true and accurate copy of the Indemnification Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.

17.     The Indemnification Agreement's Paragraph 2 reads:

> Indemnity. INDEMNITOR HEREBY ASSUMES LIABILITY FOR AND AGREES TO PAY, PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS LENDER (AND ANY ASSIGNEE OR PURCHASER OF ALL OR ANY INTEREST IN THE NOTE AND THE SECURITY INTEREST) FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES), CAUSES OF ACTION, SUITS, CLAIMS, DEMANDS AND JUDGMENTS WHICH AT ANY TIME MAY BE IMPOSED UPON, INCURRED BY OR AWARDED AGAINST LENDER AND FOR WHICH BORROWER AT ANY TIME MAY BE PERSONALLY LIABLE PURSUANT TO THE NON-RECOURSE EXCEPTIONS (AS DEFINED IN PARAGRAPH 12 OF THE NOTE. EACH PERSON OR PARTY EXECUTING THIS INDEMNITY AGREES THAT THE LIABILITY HEREUNDER SHALL BE JOINT AND SEVERAL.

18.     Paragraph 10 of the Indemnification Agreement says that it may be freely assigned by Lender, its successors, endorsees, and assigns.

19.     As a separate, unsecured obligation of HB Gastonia and the Indemnitors to the Lender, HB Gastonia and the Indemnitors executed an Environmental Indemnity Agreement on October 23, 2006 ("Environmental Agreement"). A true and accurate copy of the Environmental Agreement is attached hereto as **Exhibit C** and incorporated herein by reference.

20.    HB Gastonia executed the Environmental Agreement in its corporate capacity, and Balestra, Ward, Schlanger, Harpel, and McGruder each executed the Environmental Agreement in his individual capacity.

21.    Paragraph 2 of the Environmental Agreements reads:

> Indemnity. **INDEMNITOR HEREBY ASSUMES LIABILITY FOR AND AGREES TO PAY, PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS LENDER FROM AND AGAINST ANY AND ALL ENVIRONMENTAL LOSSES, EXCLUDING ANY SUCH LOSSES ARISING FROM LENDER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. A SEPARATE RIGHT OF ACTION HEREUNDER SHALL ARISE EACH TIME LENDER ACQUIRES KNOWLEDGE OF ANY MATTER INDEMNIFIED BY INDEMNITOR UNDER THIS INDEMNITY. SEPARATE SUCCESSIVE ACTIONS MAY BE BROUGHT HEREUNDER TO ENFORCE ANY OF THE PROVISIONS HEREOF AT ANY TIME AND FROM TIME TO TIME. NO ACTION HEREUNDER SHALL PRECLUDE ANY SUBSEQUENT ACTION, AND INDEMNITOR HEREBY WAIVES AND COVENANTS NOT TO ASSERT ANY DEFENSE IN THE NATURE OF SPLITTING OF CAUSES OF ACTION OR MERGER OR JUDGMENTS. EACH PERSON OR PARTY EXECUTING THE INDEMNITY AGREES THAT THE LIABILITY HEREUNDER SHALL BE JOINT AND SEVERAL.**

22.    HB Gastonia and the Indemnitors represented in the Environment Agreement that they would keep the Mortgaged Property free from Hazardous Material and in compliance with all Environmental Laws and promised to remove any such Hazardous Material and/or cure any such violations, as applicable, as required by law, promptly after it becomes aware of same, at their sole expense.

23.    Paragraph 11 says the Environmental Agreement may be freely assigned by Lender, its successors, endorsees, and assigns.

24. On or around October 30, 2006, PNC Bank, National Association assigned all of its rights, title, and interest in the Promissory Note, Deed of Trust, and other loan documents to Wells Fargo Bank, National Association, as trustee for the registered holders of CD 2007-CD4 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series CD 2007-CD4 ("Wells Fargo Bank") as evidenced by that certain Assignment of Deed of Trust, Security Agreement, and Assignment of Leases and Rents recorded in Book 4341 at Page 1520 of the Register of Deeds for Gaston County ("PNC Bank Assignment").

25. On or around July 6, 2009, Wells Fargo Bank assigned all of its right, title, and interest in the Promissory Note, Deed of Trust, and other loan documents to U.S. Bank National Association, as Trustee for the Registered Holders of CD 2007-CD4 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series CD 2007-CD4 ("U.S. Bank") as evidenced by that certain Assignment of Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing and Assignment of Assignment of Leases and Rents recorded in Book 4485 at Pages 2199-2201of the Register of Deeds for Gaston County ("Wells Fargo Assignment").

26. On October 1, 2013, HB Gastonia failed to make a monthly payment pursuant to the Promissory Note and thus defaulted on the Promissory Note.

27. In or around December 2015, U.S. Bank assigned all of its rights, title, and interest in the Promissory Note, Deed of Trust, Indemnification Agreement, Environmental Agreement, and other loan documents to Gastonia 1228 Investments, LLC, as evidenced by the allonge attached hereto as **Exhibit D** and incorporated herein by reference.

28. On December 14, 2015, Gastonia 1228 sent a demand letter to HB Gastonia, informing HB Gastonia of its default and demanding payment of the outstanding principal

balance, of miscellaneous amounts due, of the late charge balance, and of Gastonia 1228's attorneys' fees ("First Demand Letter"). The letter also noted that HB Gastonia did not pay property taxes on the Property for tax years 2014 and 2015. A true and accurate copy of the First Demand Letter is attached hereto as **Exhibit E** and incorporated herein by reference.

29. HB Gastonia never responded to this demand letter.

30. HB Gastonia failed to make any monthly payments pursuant to the Promissory Note from October 1, 2013 and onward.

31. On December 14, 2015, Gastonia 1228 sent a letter to HB Gastonia and the five individual Indemnitors ("Second Demand Letter"). In this letter, Gastonia 1228 accused HB Gastonia of committing waste, or of permitting HB Gastonia's tenant(s) to commit waste, on the Property. Gastonia 1228 also put HB Gastonia and the Indemnitors on notice of their individual liability for each of the Non-Recourse Exceptions set forth in Paragraph 12 of the Promissory Note. A true and accurate copy of the Second Demand Letter is attached hereto as **Exhibit F** and incorporated herein by reference.

32. Gastonia 1228, also in the Second Demand Letter, confronted HB Gastonia about the Environmental Losses on the Property and gave HB Gastonia notice that Gastonia 1228 was going to enter the Property, pursuant to the given right in the Deed of Trust, to investigate the waste and Environmental Losses on the Property.

33. Gastonia 1228 invited HB Gastonia to be present at any investigation and warned HB Gastonia that it would be liable for any damages suffered due to waste or Environmental Losses, including the costs of investigation, remediation, and reasonable attorneys' fees.

34.    On October 8, 2014, Metropolitan Solutions, a provider of business solutions for environmental problems, submitted a Phase I Environmental Site Assessment ("MS ESA I") for the Property.

35.    The MS ESA I found that there is significant oil staining present on the warehouse floors. There is such substantial staining that a potential exists for a release to the subsurface. This staining constitutes a Recognized Environmental Condition.

36.    Metropolitan Solutions also found that there was a potential vapor encroachment condition on the site due to the proximity of known or suspected source of volatile organic compound contamination on the site and an adjacent property.

37.    On January 19, 2016, environmental consulting firm Hart & Hickman, PC ("H&H") submitted a Phase I Environmental Site Assessment regarding the Property) ("H&H ESA I").

38.    H&H found that there was "significant oil staining and pooling throughout the large and small forming areas in the central portion of the building" on the Property. The oil was mobilized by condensation and accumulated on the ceiling and rafters and is continually dripping down onto the floors. H&H determined that the observed impact from the oil constituted a Recognized Environmental Condition.

39.    On January 21, 2016, Partner Engineering and Science, Inc. ("Partner ESI") submitted a Property Condition Report to Forsite Development, Inc. ("Property Condition Report"). The Property Condition Report's purpose was to evaluate the general overall physical condition of the Property and to identify physical deficiencies. The report was focused on observing and documenting visible materials and building system defects that would affect the

value of the Property and determining if conditions existed that might have a significant detrimental impact on the continued operation of the Property.

40.     Partner ESI was unable to evaluate the non-operational building systems, including the life-safety, water, and electrical systems, because the power was off at the Property. Thus, Partner ESI's report only includes defects that were able to be seen by flashlight. It is possible that additional defects will be visible once power is restored and the Property is assessed with more light.

41.     Partner ESI was also unable to inspect the roof of the storage buildings, the fire pump building, and boiler rooms because the condition of the Property did not allow for safe access.

42.     The Property Condition Report identified numerous defects that will affect the value of the Property and that are attributable to HB Gastonia's acts of destruction and neglect of the Property. The defects include, without limitation, the following:

a.     Roofing systems have areas of deteriorated seams, surface deterioration, and buckling of insulation under the membrane;

b.     Evidence of water damage that is indicative of roof leaks;

c.     Copper wiring from the electrical system has been vandalized and stolen;

d.     Extensive areas of microbial growth;

e.     Standing water in the basement;

f.     Extensive linear and alligator cracking and surface deterioration of the asphalt pavement;

g.     The Natural Gas meters from the vacant building have been removed;

h.     Exterior steel components such as stairs and handrails are rusted and corroded.

43.     The estimated costs of repairing the above-listed conditions is significant.

44.     On February 18, 2016, Gastonia 1228 sent a letter to HB Gastonia and the five individual Indemnitors ("Third Demand Letter"). In this letter, Gastonia 1228 updated HB Gastonia on its waste and Environmental Losses investigations, detailing the findings and attempting to set up a meeting with HB Gastonia and the Indemnitors to resolve the issues. A true and accurate copy of the Third Demand Letter is attached hereto as **Exhibit G** and incorporated herein by reference.

45.     As of the date of the filing of this Complaint, HB Gastonia has failed to respond to Gastonia 1228's letters.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract — Environmental Agreement)

46. Paragraphs 1 through 45 above are realleged and incorporated herein by reference.

47.     The Environmental Agreement is a valid contract.

48.     Because HB Gastonia signed the Environmental Agreement in its corporate capacity and the five individuals signed in their individual capacities, the liability under this Environmental Agreement is joint and several, and the individual signatories can be held personally liable.

49.     Gastonia 1228 satisfactorily performed its duties and obligations under the Environmental Agreement.

50.     HB Gastonia and the individual Indemnitors have breached the Environmental Agreement in numerous ways, including but not limited to: (i) failing to keep the Property free from hazardous material and in compliance with all environmental laws; (ii) failing and refusing to remove Hazardous Materials from the Property; (iii) allowed Hazardous Materials to cause significant damage to the Property and resulting losses to the Lender; (iv) allowed violations of Environmental Laws to occur on the Property; (v) failed to ever inform Gastonia 1228 of the

existence of the hazardous materials or violations of Environmental Laws; and (vi) failed to remove the Hazardous Material from the Property.

51.     HB Gastonia and the individual Indemnitors' breached the Environmental Agreement by failing and refusing to take any action to correct or remediate the conditions of Property despite notice of the Environmental damages.

52.     HB Gastonia's and the Indemnitors' breach of the Environmental Agreement damaged Gastonia 1228 in an amount in excess of $25,000.00.

53.     By reason of the foregoing, Gastonia 1228 is entitled to have and recover from HB Gastonia and the individual Indemnitors an amount in excess of $25,000.00 plus interest at the highest legal rate from the date of breach until paid in full, plus recovery of its attorneys' fees as provided in the Environmental Agreement.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract/Waste — Promissory Note and Indemnification Agreement)**

54.     Paragraphs 1 through 53 above are realleged and incorporated herein by reference.

55.     The Promissory Note is a valid contract.

56.     The Indemnification Agreement is a valid contract.

57.     The Promissory Note, pursuant to Paragraph 4, is secured by the Indemnification Agreement.

58.     The Promissory Note in its carve out of Non-Recourse Exceptions provides that Gastonia 1228 can enforce liability against other assets, property, and funds of HB Gastonia if HB Gastonia commits waste on the Property.

59.    The Indemnification Agreement establishes in Paragraph 2 that liability for damages and losses, such as waste, will be joint and several as between HB Gastonia and the five individual Indemnitor signatories.

60.    Gastonia 1228 satisfactorily performed its duties and obligations under the Promissory Note and the Indemnification Agreement.

61.    HB Gastonia is the record owner of the Property, and any leasing of the Property to a tenant does not strip HB Gastonia of its possessory rights. HB Gastonia remains responsible for any damages to the Property.

62.    HB Gastonia breached the Promissory Note by committing both voluntary and permissive waste.

63.    HB Gastonia and the Indemnitors breached the Indemnification Agreement by committing both voluntary and permissive waste.

64.    Defendants' acts of voluntary waste include removing or allowing the removal of the natural gas meters from the Property, thus impairing the Property's value and ability to operate as a business.

65.    Defendants' acts of permissive waste include the failure to pay property taxes and the substantial neglect of the Property that resulted in oil staining, microbial growth, cracking of the asphalt pavement, and deterioration of the roof, which led to substantial water intrusion and destruction and impairment to the Property.

66.    Defendants' actions and refusal and failure to take certain actions resulted in destruction, impairment, and injury to the Property.

67.    Defendants have failed and refused to take any corrective action regarding the destruction, impairment, and injury to the Property.

68.     Defendants' action and/or inaction by allowing waste on the Property and failing and refusing to correct or repair the destruction, impairment, and injury constitutes a breach of the Promissory Note and Indemnification Agreement.

69.     HB Gastonia's breach of the Promissory Note, and HB Gastonia's and the Indemnitors' breach of the Indemnification Agreement, which secures the Promissory Note, damaged Gastonia 1228 in an amount in excess of $25,000.00.

70.     By reason of the foregoing breaches, Gastonia 1228 is entitled to have and recover from HB Gastonia and the individual Indemnitors an amount in excess of $25,000.00 plus interest at the highest legal rate from the date of breach until paid in full, plus recovery of attorneys' fees as provided in the Promissory Note and Indemnification Agreement.

71.     By reason of the foregoing, Gastonia 1228 is entitled to have a recover from HB Gastonia and the individual Indemnitors an amount in excess of $25,000.00, treble damages pursuant to N.C. Gen. Stat. § 1-533, and recovery of its attorneys' fees as provided in the Promissory Note and Indemnification Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gastonia 1228 Investments, LLC respectfully prays the Court as follows:

1.     On the First Claim for Relief, that the Court enter judgment in favor of Plaintiff and against Defendants HB Gastonia, LLC,  Victor P. Balestra, Nathan S. Ward, Richard Schlanger, James W. Harpel, and Shaun L. McGruder, jointly and severally, for a principal sum in excess of $25,000.00, plus accrued interest at the legal rate of 8% per annum from the date of breach until paid;

2.   On the Second Claim for Relief, that the Court enter judgment in favor of Plaintiff and against Defendants HB Gastonia, LLC, Victor P. Balestra, Nathan S. Ward, Richard Schlanger, James W. Harpel, and Shaun L. McGruder, jointly and severally, for a principal sum in excess of $25,000.00, plus accrued interest at the legal rate of 8% per annum from the date of breach until paid;

3.   That on the Second Claim for Relief, the Court enter judgment in favor of Plaintiff and against Defendants HB Gastonia, LLC, Victor P. Balestra, Nathan S. Ward, Richard Schlanger, James W. Harpel, and Shaun L. McGruder, jointly and severally, for treble damages pursuant to N.C. Gen. Stat. § 1-533;

4.   That Plaintiff recover attorneys' fees pursuant to the terms of the Environmental Agreement, the Promissory Note, and the Indemnity Agreement;

5.   That the Court tax the costs of this action against the Defendants; and

6.   That Plaintiff have such other and further relief as the Court may deem just and proper.

This the 23rd day of May, 2016.

Kenneth T. Lautenschlager, NC State Bar No. 23246
JOHNSTON, ALLISON & HORD, P.A.
Post Office Box 36469
1065 East Morehead Street
Charlotte, North Carolina 28204
Tel: 704/332-1181; Fax: 704/376-1628
Email: klauten@jahlaw.com
*Attorneys for Gastonia 1228 Investments, LLC*

STATE OF NORTH CAROLINA

COUNTY OF _Mecklenburg_

**VERIFICATION**

Houston Roberts, Member of Gastonia 1228 Investments, LLC, being first duly sworn, deposes and says that he has read the foregoing Complaint, and knows the content thereof, and that the statements therein contained are true of his own personal knowledge except those matters therein stated upon information and belief, and as to those matters, he believes the same to be true.

This the 20 th day of May, 2016.

_____
Houston Roberts, Member
Gastonia 1228 Investments, LLC

SWORN TO AND SUBSCRIBED BEFORE ME
this the 20 th day of May, 2016.

_____
Notary Public

Shannon H. Doster
_____
(Print Name Notary Public)

My Commission Expires: 9/23/2017

(NOTARIAL SEAL)

SHANNON H DOSTER
Notary Public
Mecklenburg County
My Commission Expires
09/23/2017
NORTH CAROLINA

## PROMISSORY NOTE

$3,200,000.00

1228 Isley Drive
Gastonia, North Carolina
Property Tax Identification No. 135866
October 23, 2006

FOR VALUE RECEIVED, **HB GASTONIA, LLC**, a Florida limited liability company ("Borrower"), having its principal place of business at 3135 S.W. Third Avenue, Miami, Florida 33129, promises to pay to the order of PNC Bank, National Association ("Lender"), at the following address: 10851 Mastin, Suite 300, Overland Park, Kansas 66210, or such other place as the holder hereof may from time to time designate in writing, the principal sum of THREE MILLION TWO HUNDRED THOUSAND AND NO/100 DOLLARS ($3,200,000.00) in lawful money of the United States of America, with interest thereon to be computed from the date of disbursement under this Promissory Note (this "Note") at the Applicable Interest Rate (hereinafter defined), and to be paid in installments as follows:

        A.    A payment, on the date of disbursement, representing interest from the date of disbursement through the last day of the calendar month in which such disbursement is made;

        B.    A payment of interest only on the first day of December, 2006 and on the first day of each calendar month thereafter up to and including the first day of November, 2008; and

        C.    A constant payment of $20,794.05 (based upon an amortization schedule assuming a 360 day year consisting of 12 months of 30 days each) on the first day of December, 2008 and on the first day of each calendar month thereafter up to and including the first day of October, 2016; and

        D.    The balance of said principal sum, all unpaid interest thereon and all other amounts owed pursuant to this Note, the Security Instrument (hereinafter defined), the Other Security Documents (hereinafter defined), or otherwise in connection with the loan evidenced by this Note shall be due and payable on the first day of November, 2016 (the "Maturity Date").

All payments to be made by Borrower to Lender shall be deemed received by Lender only upon Lender's actual receipt of same.

    1.    Applicable Interest Rate.    Interest accruing on the principal sum of this Note shall be calculated based upon a per annum interest rate divided by 360 days resulting in a per diem interest amount that will accrue for each calendar day in a year of 365 days (366 days in a leap year). The term "Applicable Interest Rate" as used in this Note shall mean, from the date of this Note through and including the Maturity Date, a rate of Six and 09/100th percent (6.09%) per annum.

    2.    Application.    All payments on this Note shall be applied at any time and from time to time in the following order: (i) the payment or reimbursement of any expenses (including but not limited to late charges), costs or obligations (other than the principal hereof and interest hereon) for which Borrower shall be obligated or Lender entitled pursuant to the provisions hereof or of the Security Instrument or the Other Security Documents, (ii) the payment of accrued but unpaid interest thereon, (iii) the payment of unpaid

4853540.9



EXHIBIT

A

escrow amounts required herein, in the Security Instrument or in the Other Security Documents, and (iv) the payment of all or any portion of the principal balance then outstanding hereunder, in either the direct or inverse order of maturity, at Lender's option.

3.    Late Charge. If any part of the Debt (hereinafter defined) is not actually received by Lender by close of business on the fifteenth (15th) day after the date on which it was due, Borrower shall pay to Lender an amount (the "Late Charge") equal to the lesser of four percent (4.0%) of such unpaid portion of the missed payment or the maximum amount permitted by applicable law, to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. All such Late Charges shall be automatically due and payable without notice or demand and shall be secured by the Security Instrument and the Other Security Documents.

4.    Security; Defined Terms; Incorporation by Reference. This Note is secured by the Security Instrument and the Other Security Documents. The term "Security Instrument" as used in this Note shall mean the Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing, executed and delivered by Borrower contemporaneously with this Note and which secures the Debt. The term "Other Security Documents" means all documents other than this Note or the Security Instrument now or hereafter executed and/or delivered by Borrower and/or others and/or to or in favor of Lender, which wholly or partially secure, evidence or guarantee payment of the Debt, provide for any indemnity in favor of or payment to Lender related to the Debt, this Note or the Mortgaged Property, provide for any escrow/holdback arrangements or for any actions to be completed by Borrower subsequent to the date hereof, or are otherwise related to the loan evidenced by this Note. All amounts due and payable under this Note, together with all sums due under the Security Instrument and the Other Security Documents, including any applicable Prepayment Consideration (hereinafter defined) and all applicable attorney fees and costs, are collectively referred to herein as the "Debt." Where appropriate, the singular number shall include the plural, the plural shall include the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, personal representatives, executors and administrators.

5.    Prepayment/Defeasance.

(a)    When Permitted. Prior to September 1, 2016 (the "Early Payment Date"), Borrower shall not have the right to prepay all or any portion of the Debt at any time during the term of this Note (except for any prepayment permitted under the Security Instrument in the event of a casualty or condemnation). No Prepayment Consideration (hereinafter defined) will be due from any prepayment of this Note (in whole but not in part) on or after the Early Payment Date. Notwithstanding the foregoing or anything else to the contrary herein, upon the completion of a defeasance as set forth below, Borrower shall have no further right to prepay all or any portion of the Debt. In the event of a prepayment on or after such date, Borrower shall pay, together with the amount of such prepayment, an amount equal to (i) all accrued and unpaid interest, and (ii) any other sums due under this Note, the Security Instrument or any Other Security Document. Additionally, any such prepayment not actually received by Lender before 5:00 p.m., central time, on the 5th day of any calendar month must also include the interest which would have accrued on the amount of such prepayment during the entire calendar month in which the prepayment is made.

(b)    Notice. Borrower may give written notice to Lender specifying the date, which date must be on or after the Early Payment Date, on which a full prepayment of the Debt is to be made (the date of any prepayment hereunder, whether pursuant to such notice or not, and whether voluntary or involuntary, being herein called the "Prepayment Date"). Lender shall receive this notice not more than sixty (60) days and not less than thirty (30) days prior to the Prepayment Date. If any such notice of prepayment is given, the entire

-2-                                                                4853540.9

Debt, including any applicable Prepayment Consideration (as defined below), shall be due and payable on the Prepayment Date.

(c)    Prepayment After Event of Default. If following the occurrence of any Event of Default, Borrower shall tender payment of an amount sufficient to satisfy the Debt at any time prior to or after a sale of the Mortgaged Property, either through foreclosure or the exercise of the other remedies available to Lender under the Security Instrument or the Other Security Documents, such tender by Borrower shall be deemed to be a voluntary prepayment under this Note in the amount tendered and in such case Borrower shall also pay to Lender, with respect to the amount tendered, the applicable Prepayment Consideration set forth in this Note, which Prepayment Consideration shall be immediately due and payable. Lender shall not be obligated to accept any such prepayment of this Note unless it is accompanied by an amount (the "Prepayment Consideration") equal to the greater of: (x) one percent (1%) of the outstanding principal balance of this Note at the time of prepayment; or (y) the Yield Maintenance Amount (hereinafter defined).

Lender shall not be obligated to accept any such tender unless it is accompanied by all Prepayment Consideration due in connection therewith. Borrower acknowledges that the Prepayment Consideration is a bargained for consideration and not a penalty, and Borrower recognizes that Lender would incur substantial additional costs and expenses in the event of a prepayment of the Debt and that the Prepayment Consideration compensates Lender for such costs and expenses (including without limitation, the loss of Lender's investment opportunity during the period from the date such tender is accepted until the Maturity Date). Borrower agrees that Lender shall not, as a condition to receiving the Prepayment Consideration, be obligated to actually reinvest the amount prepaid in any treasury obligation or in any other manner whatsoever. Except as otherwise set forth in the Security Instrument, no Prepayment Consideration will be due for involuntary prepayments resulting from any Casualty (as defined in the Security Instrument) or Condemnation (as defined in the Security Instrument).

Yield Maintenance Amount. The "Yield Maintenance Amount" shall mean the present value, as of the Prepayment Date, of the remaining scheduled payments of principal and interest from the Prepayment Date through the Maturity Date (including any balloon payment) determined by discounting such payments at the Discount Rate (hereinafter defined), less the amount of principal being prepaid. The term "Discount Rate" shall mean the rate which, when compounded monthly, is equivalent to the Treasury Rate (hereinafter defined) when compounded semi-annually. The term "Treasury Rate" shall mean the yield calculated by the linear interpolation of the yields, as reported in Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading U.S. Government Securities/Treasury Constant Maturities for the week ending prior to the Prepayment Date, of U.S. Treasury constant maturities with maturity dates (one longer and one shorter) most nearly approximating the Maturity Date. (In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Treasury Rate.) Lender shall notify Borrower of the amount and the basis of determination of the required Prepayment Consideration.

(d)    Defeasance. Any provision hereof to the contrary notwithstanding, at any time during the Defeasance Period (as defined below), Borrower may obtain a release of the Mortgaged Property from the lien of the Security Instrument only upon the satisfaction of the following conditions:

(i)    not less than thirty (30) days prior written notice shall be given to Lender specifying a date (the "Defeasance Date") on which the Defeasance Collateral (as defined below) is to be delivered, such date being the first day of the month;

-3-

4853540.9

(ii) all accrued and unpaid interest and all other sums due under this Note, the Security Instrument and the Other Security Documents up to the Defeasance Date, including, without limitation, all reasonable costs and expenses incurred by Lender or its agents in connection with such defeasance, including, without limitation, any legal fees and expenses incurred in connection with obtaining and reviewing the Defeasance Collateral, the preparation of the Defeasance Security Agreement (as defined below) and related documentation, accountant fees, and investment advisor fees, all of which shall be paid in full on or prior to the Defeasance Date;

(iii) no Event of Default, and no event or condition that, with the giving of notice or passage of time or both, would constitute an Event of Default, shall exist either at the time Borrower gives notice of the Defeasance Date to Lender or on the Defeasance Date;

(iv) Borrower shall deliver to Lender on or before the Defeasance Date direct, non-callable obligations of the United States of America in such form and amount that provide for the payments prior, but as close as possible, to all successive regularly scheduled monthly payment dates, including the Maturity Date, with such payments being equal to or greater than the amount of the corresponding monthly payment required to be paid under this Note (hereafter, "Scheduled Defeasance Payments") for the balance of the term hereof and the amount required to be paid on the Maturity Date (such obligations are collectively and singularly referred to herein as "Defeasance Collateral") each of which shall be duly endorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance wholly satisfactory to Lender (including, without limitation, such instrument as may be required by the depository institution holding such securities or the issuer thereof, as the case may be, to effectuate book-entry transfers and pledges through the book-entry facilities of such institution) in order to perfect a first priority security interest in such Defeasance Collateral in favor of Lender. The Defeasance Collateral may be purchased by Lender on Borrower's behalf, in which case Borrower shall deposit with Lender at least three days before the Defeasance Date a sum sufficient, in Lender's sole and absolute discretion, to purchase the Defeasance Collateral. Any sums in excess of the amount necessary to purchase the Defeasance Collateral shall be remitted to Borrower upon release of the Mortgaged Property.

(v) Borrower shall deliver the following to Lender, at Borrower's cost, on or prior to the Defeasance Date:

(A) a pledge and security agreement, in form and substance satisfactory to Lender in its sole discretion, creating a first priority security interest in favor of Lender in the Defeasance Collateral (the "Defeasance Security Agreement");

(B) a certificate of Borrower certifying that all of the requirements hereunder for a defeasance have been satisfied;

(C) an opinion of counsel in form and substance and delivered by counsel satisfactory to Lender in its sole discretion stating, among other things, (x) that Lender has a perfected first priority security interest in the Defeasance Collateral, (y) that the Defeasance Security Agreement is enforceable against Borrower in accordance with its terms and (z) that the defeasance will not cause the entity which holds this Note to fail to qualify as a "real estate mortgage investment conduit" (a "REMIC"), within the meaning of Section 860D of the Internal Revenue Code of 1986, as amended from time to time or any successor statute (the "Code");

-4-

4853540.9

(D)     an opinion of an independent certified public accountant acceptable to Lender representing and warranting to Lender that the Defeasance Collateral will generate monthly amounts equal to or greater than the Scheduled Defeasance Payments including the amount required to be paid on the Maturity Date of this Note, and such other approvals required by Lender;

(E)     evidence in writing from each of the Rating Agencies to the effect that such release will not result in a qualification, downgrade or withdrawal of any rating in effect immediately prior to the Defeasance Date for any securities or "Pass-Through Certificates" issued pursuant to the terms of a trust and servicing agreement in the event that this Note or any interest therein is included in a REMIC or other securitization vehicle;

(F)     such other certificates, opinions, documents or instruments as Lender may reasonably require; and

(G)     upon approval by Lender of the schedule of Defeasance Collateral to be delivered to Lender, Borrower shall (i) pay Lender a nonrefundable fee, in an amount reasonably determined by Lender, as compensation for the review, analysis and processing of the defeasance request; and (ii) if required by Lender, deposit with Lender an amount estimated by Lender to be sufficient to fund all other fees, costs and expenses related to the defeasance, including Lender's reasonable attorneys' fees and expenses and rating agency fees, if any and expenses together with all expenses and costs associated with the release of the lien on the Mortgaged Property. Borrower shall be responsible for all fees, costs and expenses associated with the defeasance which, if not covered by the above deposit, shall be paid to Lender no later than the Defeasance Date.

Upon compliance with the foregoing requirements relating to the delivery of the Defeasance Collateral, the Mortgaged Property shall be released from the lien of the Security Instrument and the Defeasance Collateral shall constitute collateral which shall secure this Note and the Debt.

The "Defeasance Period" shall mean the period of time: (1) commencing on the date which is the later to occur of: (A) two (2) years after the "start-up day", within the meaning of Section 860(G)(a)(9) of the Code, of the REMIC that holds this Note; and (B) three (3) years after the date of the first regularly scheduled monthly payment due hereunder, and (2) ending on the Early Payment Date. The "Rating Agencies" shall mean, collectively, Standard & Poor's Ratings Services, Moody's Investors Service, Inc., Fitch IBCA, Inc., and their respective successors and assigns, to the extent each of the foregoing performed credit rating services for the REMIC or other securitization vehicle which owns this Note.

(e)     Successor Borrower.  In connection with a defeasance under this Section, Borrower shall establish or designate a successor entity (the "Successor Borrower") which shall be a single purpose entity approved by Lender in its sole discretion. Borrower shall transfer and assign all obligations, rights and duties under and to this Note together with the Defeasance Collateral to such Successor Borrower. Such Successor Borrower shall assume the obligations under this Note and the Security Instrument and Borrower shall be relieved of its obligations under such documents except for any such representations that specifically survive the defeasance.  Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under this Note and the Security Instrument.  Borrower shall pay all costs and expenses incurred by Lender, including Lender's attorneys' fees and expenses, incurred in connection with establishment of the Successor Borrower.

4853540.9

(f)     Defeasance Collateral Account. All cash from interest and principal payments paid on the Defeasance Collateral shall be paid over to Lender for each Scheduled Defeasance Payment and applied first to accrued and unpaid interest and then to principal. Any cash from interest and principal paid on the Defeasance Collateral not needed to pay accrued and unpaid interest or principal shall be retained in a designated account established by Borrower or Successor Borrower as the case may be, (the "Defeasance Collateral Account") which shall constitute additional collateral for the loan evidenced hereby. The Defeasance Collateral Account shall contain only cash from interest and principal paid on the Defeasance Collateral. Borrower or Successor Borrower, as applicable, shall be the owner of the Defeasance Collateral Account and shall report all income accrued thereon for federal, state and local income tax purposes and shall pay all costs and expenses associated with opening and maintaining the account and may pay all costs and expenses associated with maintaining the Successor Borrower from such account. Lender shall have no responsibility to fund any Scheduled Defeasance Payments and shall not be liable in any way by reason of any insufficiency in the Defeasance Collateral Account. Upon an assumption by Successor Borrower acceptable to Lender, Borrower shall be relieved of its obligations under this Note and the Defeasance Security Agreement and, to the extent such documents relate to the Mortgaged Property, the Other Security Documents.

(g)     Release of Security Instrument Following Defeasance. Upon compliance with the requirements hereunder for a defeasance, the Mortgaged Property shall be released from the lien of the Security Instrument and the Other Security Documents, and the Defeasance Collateral shall constitute collateral securing this Note. Lender will, at Borrower's expense, execute and deliver any agreements reasonably requested by Borrower to release the lien of the Security Instrument from the Mortgaged Property.

(h)     Purchase of Defeasance Collateral. In the event of purchase by Lender of the Defeasance Collateral, such purchase may, in Lender's sole and absolute discretion be through an affiliate of Lender or a third party entity. Borrower shall be responsible for the payment of any brokerage or other transaction fees in connection with such purchase.

6.     Default. An "Event of Default" shall occur if:

(a)     Borrower fails to make the full and punctual payment of any amount payable hereunder or under the Security Instrument or Other Security Documents, which failure is not cured on or before the fifth (5th) day after the date of written notice from Lender to Borrower of such failure;

(b)     Borrower fails to pay the entire outstanding principal balance hereunder, together with all accrued and unpaid interest, on the date when due, whether on the Maturity Date, upon acceleration or prepayment or otherwise; or

(c)     an Event of Default (as defined in the Security Instrument or any of the Other Security Documents) has occurred under the Security Instrument and/or Other Security Documents.

7.     Acceleration. The whole of the Debt, including without limitation, the principal sum of this Note, all accrued interest and all other sums due under this Note, the Security Instrument and the Other Security Documents, together with any applicable Prepayment Consideration, shall become immediately due and payable at the option of Lender, without notice, at any time following the occurrence of an Event of Default.

-6-

4853540.9

8.      Default Interest.  Upon the occurrence of an Event of Default (including without limitation, the failure of Borrower to pay the Debt in full on the Maturity Date), Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal balance at the rate (the "Default Rate") equal to the greater of: (a) four percent (4%) above the Applicable Interest Rate; or (b) four percent (4%) above the Prime Rate (hereinafter defined) in effect at the time of the occurrence of the Event of Default; provided, however, that notwithstanding the foregoing, in no event shall the Default Rate exceed the Maximum Rate (hereinafter defined).  The term "Prime Rate" shall mean the prime rate reported in the Money Rates section of The Wall Street Journal for the date (the "Default Rate Calculation Date") upon which the Event of Default occurred, or if no publication occurs upon such date, then the date of publication immediately preceding the date of the Event of Default.  In the event that The Wall Street Journal should cease or temporarily interrupt publication, the term "Prime Rate" shall mean the daily average prime rate published upon the Default Rate Calculation Date in another business newspaper, or business section of a newspaper, of national standing chosen by Lender.  In the event that a prime rate is no longer generally published or is limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index which is readily available and verifiable to Borrower but is beyond Lender's control.  The Default Rate shall be computed from the occurrence of the Event of Default until the actual payment in full of the Debt.  This charge shall be added to the Debt, and shall be deemed secured by the Security Instrument.  This clause, however, shall not be construed as an agreement or privilege to extend the Maturity Date, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

9.      Attorney Fees.  In the event that Lender employs attorney(s) to collect the Debt, to enforce the provisions of this Note or to protect or foreclose the security herefor, Borrower agrees to pay Lender's reasonable attorney fees and disbursements, whether or not suit be brought.  Such fees shall be immediately due and payable.

10.     Limit of Validity.  This Note is subject to the express condition that at no time shall Borrower be obligated or required to pay interest or other charges on the Debt at a rate which may subject Lender to civil or criminal liability as a result of such rate exceeding the maximum interest rate which Borrower is permitted to pay by applicable law (the "Maximum Rate").  If by the terms of this Note, Borrower is at any time required or obligated to pay interest or other charges on the Debt at a rate in excess of the Maximum Rate, the rate of interest due under this Note shall be deemed to be immediately reduced to the Maximum Rate and any previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

11.     No Oral Amendments.  This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

12.     Exculpation. Subject to the provisions of this Section, Borrower's liability under this Note, the Security Instrument or the Other Security Documents shall only extend to the Mortgaged Property and other collateral given to secure the Debt, and Lender shall not enforce such liability against any other asset, property or funds of Borrower; provided, however, the foregoing shall not:

(a)     impair the right of Lender to bring suit and obtain personal, recourse judgments against any person or entity (including Borrower) relating to any losses (including attorney's fees and court costs) sustained by Lender in connection with any fraud, intentional misrepresentation, waste, or

-7-                                                 4853540.9

misappropriation of tenant security deposits or rents collected more than one (1) month in advance by Borrower;

        (b)    impair the right of Lender to name, and obtain a judgment against any person or entity (including Borrower) to the extent required by law to either obtain a judgment of specific performance with respect to any of the provisions of this Note, the Security Instrument or any of the Other Security Documents, or to foreclose the Security Instrument and obtain title to the Mortgaged Property and other collateral given to secure the Debt;

        (c)    affect the validity or enforceability of, or impair the right of Lender to bring suit and obtain personal, recourse judgments against any person or entity (including Borrower) to enforce any guaranty, indemnity or release of liability made by such person or entity (whether made in this Note, the Security Instrument, any of the Other Security Documents or in any other separate agreement);

        (d)    impair the right of Lender to obtain the appointment of a receiver;

        (e)    impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; or

        (f)    affect the validity or enforceability of, or impair the right of Lender to bring suit and obtain personal, recourse judgments against any person or entity (including Borrower) relating to any losses sustained by Lender in connection with any of the provisions of this Note, the Security Instrument or any of the Other Security Documents requiring that: (i) any person or entity maintain any insurance over any of the Mortgaged Property, or (ii) any insurance proceeds or condemnation awards be paid to Lender; or

        (g)    impair the right of Lender to bring suit and obtain personal, recourse judgments against any person or entity (including Borrower) for the full amount of the Debt if the Mortgaged Property or any part thereof shall become an asset in: (i) a voluntary bankruptcy or insolvency proceeding, or (ii) an involuntary bankruptcy or insolvency proceeding: (A) which is commenced by any person or entity controlling, controlled by or under common control with Borrower (the "Borrowing Group") or (B) in which any member of the Borrowing Group objects to a motion by Lender for relief from any stay or injunction from the foreclosure of the Security Instrument or any other remedial action permitted under this Note, the Security Instrument or any of the Other Security Documents.

Items (a) through (g) above are collectively the "Non-Recourse Exceptions". To the extent Borrower is a general partnership and Lender is required under applicable law to pursue its remedies against the persons or entities constituting Borrower, each reference to the phrase "(including Borrower") in the Non-Recourse Exceptions shall be deemed to read "(including Borrower or any person or entity constituting Borrower)". Borrower's liability under the Non-Recourse Exceptions, excepting item (g), shall be limited to the amount of any losses or damages sustained by Lender in connection with such Non-Recourse Exceptions. Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Security Instrument or to require that all of the Mortgaged Property and other collateral given to secure the Debt shall continue to secure all of the Debt.

      13.    Assignment.    Lender and its successors, endorsees and assigns may freely transfer and assign this Note. Borrower's right to transfer its rights and obligations with respect to the Debt, and to be released from liability under this Note, shall be governed by the Security Instrument.

-8-

4853540.9

14.    Applicable Law; Jurisdiction.   This Note shall be governed and construed in accordance with the laws of the state in which the real property encumbered by the Security Instrument is located. Borrower hereby submits to personal jurisdiction in the state courts located in said state and the federal courts of the United States of America located in said state for the enforcement of Borrower's obligations hereunder and waives any and all personal rights under the law of any other state to object to jurisdiction within such state for the purposes of any action, suit, proceeding or litigation to enforce such obligations of Borrower.

15.    Joint and Several Liability.   If Borrower consists of more than one person or entity, the obligations and liabilities of each such person or entity shall be joint and several.

16.    Waiver of Presentment, Etc.   Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, and notice of intent to accelerate the maturity hereof (and of such acceleration), except to the extent that specific notices are required by this Note, the Security Instrument or the Other Security Documents.

17.    No Waiver.   Any failure by Lender to insist upon strict performance by Borrower of any of the provisions of this Note, the Security Instrument or the Other Security Documents shall not be deemed to be a waiver of any of the terms or provisions of this Note, the Security Instrument or the Other Security Documents, and Lender shall have the right thereafter to insist upon strict performance by Borrower of any and all of the terms and provisions of this Note, the Security Instrument or the Other Security Documents.

18.    Notices.   Except as otherwise specified herein, any notice, consent, request or other communication required or permitted to be given hereunder shall be in writing, addressed to the other party as set forth below (or to such other address or person as either party or person entitled to notice may by notice to the other party specify), and shall be: (a) personally delivered; (b) delivered by Federal Express or other comparable overnight delivery service; or (c) transmitted by United States certified mail, return receipt requested with postage prepaid; to:

Lender:          PNC Bank, National Association
                     10851 Mastin, Suite 300
                     Overland Park, Kansas 66210

Borrower:       HB Gastonia, LLC
                     3135 S.W. Third Avenue
                     Miami, Florida 33129
                     Attn: Mr. Victor Balestra

Unless otherwise specified, all notices and other communications shall be deemed to have been duly given on the first to occur of actual receipt of the same or: (i) the date of delivery if personally delivered; (ii) one (1) business day after depositing the same with the delivery service if by overnight delivery service; and (iii) three (3) days following posting if transmitted by mail. Borrower must prominently display Lender's Loan Number (as set forth on page 1 of this Note) on all notices or communications to Lender.

19.    Severability.   If any term, covenant or condition of this Note is held to be invalid, illegal or unenforceable in any respect, this Note shall be construed without such provision.

4853540.9

20. <u>Time of the Essence</u>. Time shall be of the essence in the performance of all obligations of Borrower hereunder.

21. <u>Additional Terms and Provisions</u>. Certain additional and supplemental terms and provisions of this Note are set forth in this paragraph. The terms and provisions of this paragraph control and supersede any conflicting terms and provisions contained in this Note.

(a) Anything herein to the contrary notwithstanding, if Lender determines, in its sole discretion, at any time during the calendar month immediately preceding the Maturity Date that the Loan will not be paid as required on the Maturity Date, Lender shall have the option to forbear from exercising its rights under this Note, the Security Instrument and the Other Security Documents to foreclose upon the Mortgaged Property (an "<u>Optional Lender Forbearance</u>"). In such event, Lender shall notify Borrower of such decision and the following shall occur:

(i) On the first day of the month immediately following the Maturity Date and on the first day of each calendar month thereafter, Borrower shall pay to Lender an amount (each a "<u>Property Cash Flow Payment Amount</u>") equal to the greater of (a) the Monthly Debt Service Payment Amount and (b) Gross Income (as defined in the Security Agreement and Lockbox Agreement (the "<u>Cash Management Agreement</u>") executed contemporaneously herewith) received by it in connection with the Mortgaged Property.

(ii) Each Property Cash Flow Payment Amount paid after the Maturity Date shall be applied in accordance with the Cash Management Agreement. Interest accrued at the Adjusted Interest Rate and not paid shall be deferred and added to the indebtedness evidenced by this Note.

(iii) Lender's decision to forbear from exercising its rights under this Note, the Security Instrument and the Other Security Documents shall be revocable at any time by Lender without notice to Borrower. Upon any such revocation, Lender shall be entitled to pursue any and all remedies available to it under this Note, the Security Instrument, the Other Security Documents, at law or in equity.

(iv) Anything herein to the contrary notwithstanding, Borrower shall have the right to pay the Loan in full after the Early Payment Date without any prepayment premium or charge.

(b) Paragraph 1 is amended to add the following at the end of said paragraph: "In the case of an Optional Lender Forbearance as provided herein, the term "<u>Applicable Interest Rate</u>" shall mean the Adjusted Interest Rate from and after the Maturity Date through and including the date this Note is paid in full. The term "<u>Adjusted Interest Rate</u>" shall mean the greater of (x) the Initial Interest Rate plus four percent (4.0%); or (y) the Yield Rate on the then-current on-the-run 10-year U.S. Treasury Obligation (the "<u>Specified U.S. Treasury Security</u>") plus four percent (4.0%). The term "Yield Rate" shall mean the yield rate for the Specified U.S. Treasury Security as such yield rate is reported in the *Wall Street Journal* on the fifth (5th) business day preceding the Maturity Date. In the event that no such yield rate is published for the Specified U.S. Treasury Security, then the nearest equivalent U.S. Treasury Security shall be selected at Lender's sole discretion, and the yield rate therefor shall be the "<u>Yield Rate</u>". If the publication of such yield rates in the *Wall Street Journal* is discontinued, Lender shall determine such yield rates from another source selected by Lender."

-10-

4853540.9

(c) Paragraph 2 is amended to insert the following at the beginning of the first sentence: "Except as set forth in the Cash Management Agreement (as defined in Paragraph 21(a)(i) below)."

(d) Subparagraph 12(f) is amended to read as follows: "(f) affect the validity or enforceability of, or impair the right of Lender to bring suit and obtain personal, recourse judgments against any person or entity (including Borrower) relating to any losses sustained by Lender in connection with (A) any of the provisions of this Note, the Security Instrument or any of the Other Security Documents requiring that: (i) any person or entity maintain any insurance over any of the Mortgaged Property or (ii) any insurance proceeds or condemnation awards be paid to Lender, or (B) for any insurance policies maintained as required by Section 3(a) of the Security Instrument containing deductible amounts greater than $50,000 as to any losses caused by terrorism and greater than $25,000 for any other covered losses."

BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY, OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THE LOAN EVIDENCED BY THIS NOTE OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE, THE SECURITY INSTRUMENT OR ANY OF THE OTHER SECURITY DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF BORROWER OR LENDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER'S MAKING OF THE LOAN SECURED BY THE SECURITY INSTRUMENT AND THE OTHER SECURITY DOCUMENTS.

4853540.9

Case 3:16-cv-00498-GCM    Document 1-1    Filed 06/29/16    Page 27 of 33

IN WITNESS WHEREOF, Borrower has duly executed this Promissory Note, under seal, to be effective the day and year first above written.

"BORROWER"

**HB GASTONIA, LLC,** a Florida limited liability company

By: _____
    Victor P. Balestra, its Manager

4853540.9

STATE OF Florida

COUNTY OF Palm Beach

I, the undersigned, a Notary Public of the County and State aforesaid, certify that the following person(s) personally appeared before me this day, and

☑ I have personal knowledge of the identity of the principal(s)
☐ I have seen satisfactory evidence of the principal's identity, by a current state or federal identification with the principal's photograph in the form of a _____

_____

☐ A credible witness has sworn to the identity of the principal(s);

each acknowledging to me that he or she voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated: __Victor Balestra__, __Manager__.

Date: October __23__, 2006                          _____

                                                    __Theodore T. Tarone__ Notary Public
                                                    (print name)

(official seal)                                     My commission expires: __8/5/2008__

-13-                                                4853540.9



Pay to the order of _____, without recourse.

PNC BANK, NATIONAL ASSOCIATION

By: _____
    Jeannette Butler, Vice President


Wells Fargo Bank, N.A., as trustee for the registered holders of CD 2007-CD4 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series CD 2007-CD4

-14-

4853540.9

## NON-RECOURSE INDEMNIFICATION AGREEMENT

THIS NON-RECOURSE INDEMNIFICATION AGREEMENT (the "Indemnity") is entered into as of October 23, 2006, by the undersigned ("Indemnitor") in favor of PNC Bank, National Association ("Lender").

### RECITALS:

A.  Contemporaneously with this Indemnity, **HB GASTONIA, LLC**, a Florida limited liability company ("Borrower") has executed and delivered its Promissory Note (the "Note") to Lender evidencing Lender's loan to Borrower in the amount of $3,200,000.00 (the "Loan").

B.  The Note is secured by, among other security: (i) the Security Instrument (as defined in the Note); and (ii) the Other Security Documents (as defined in the Security Instrument). The Note, the Security Instrument and the Other Security Documents are hereinafter collectively referred to as the "Loan Documents".

C.  As a condition to making the Loan, Lender has required that Indemnitor indemnify Lender with respect to the matters set forth herein.

D.  The extension of the Loan to Borrower is a substantial benefit to Indemnitor, and Indemnitor therefore has agreed to provide Lender the indemnity described herein.

NOW, THEREFORE, in consideration of the foregoing, of Lender making the Loan and other valuable consideration, the receipt and adequacy of which is hereby acknowledged, Indemnitor agrees as follows:

1.  Certain Defined Terms.  Unless otherwise expressly herein provided, each defined term in this Indemnity, as indicated by the initial capitalization thereof, shall have the meaning set forth in the Loan Documents. Each reference to the "Indemnitor" shall include "Indemnitors" in reference to all Indemnitors collectively, if there are more than one.

2.  Indemnity.  INDEMNITOR HEREBY ASSUMES LIABILITY FOR AND AGREES TO PAY, PROTECT, INDEMNIFY, DEFEND AND HOLD HARMLESS LENDER (AND ANY ASSIGNEE OR PURCHASER OF ALL OR ANY INTEREST IN THE NOTE AND THE SECURITY INSTRUMENT) FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES), CAUSES OF ACTION, SUITS, CLAIMS, DEMANDS AND JUDGMENTS WHICH AT ANY TIME MAY BE IMPOSED UPON, INCURRED BY OR AWARDED AGAINST LENDER AND FOR WHICH BORROWER AT ANY TIME MAY BE PERSONALLY LIABLE PURSUANT TO THE NON-RECOURSE EXCEPTIONS (AS DEFINED IN PARAGRAPH 12 OF THE NOTE). EACH PERSON OR PARTY EXECUTING THIS INDEMNITY AGREES THAT THE LIABILITY HEREUNDER SHALL BE JOINT AND SEVERAL.

3.  Absolute Indemnity; Waiver of Subrogation and Other Rights.  This Indemnity is absolute, unconditional, present and continuing. It is not conditioned or contingent upon any attempt to enforce Lender's rights against Borrower or the Mortgaged Property (as defined in the Security Instrument), to collect

4853564.6

**EXHIBIT**

*B*

from Borrower or any other person or entity or upon any other condition or contingency not set forth herein. Lender shall have the right to proceed against Indemnitor without taking any prior action to enforce the obligations of Borrower under the Loan Documents or the obligations of any other indemnitor under any indemnity. Furthermore, Lender in its sole discretion, without prior notice to or consent of Indemnitor, may elect to: (a) foreclose either judicially or nonjudicially against any real or personal property security it may hold for the Loan; (b) accept a transfer of any such security in lieu of foreclosure; (c) compromise or adjust the Loan or any part of it or make any other accommodation with Borrower or Indemnitor; or (d) exercise any other remedy against Borrower or any security. No such action by Lender shall release or limit the liability of Indemnitor, who shall remain liable under this Indemnity after the action, even if the effect of the action is to deprive Indemnitor of any subrogation rights, rights of indemnity, or other rights to collect reimbursement from Borrower for any sums paid to Lender, whether contractual or arising by operation of law or otherwise. Indemnitor expressly agrees that under no circumstances shall it be deemed to have any right, title, interest or claim in or to any real or personal property to be held by Lender or any third party after any foreclosure or transfer in lieu of foreclosure of any security for the Loan. The rights and remedies of Lender under this Indemnity shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Regardless of whether Indemnitor may have made any payments to Lender, Indemnitor forever waives: (I) all rights of subrogation, all rights of indemnity, and any other rights to collect reimbursement from Borrower for any sums paid to Lender, whether contractual or arising by operation of law or otherwise; (II) all rights to enforce any remedy that Lender may have against Borrower; and (III) all rights to participate in any security now or later to be held by Lender for the Loan.

4.    Extent of Liability; Waivers. Indemnitor's liability hereunder shall not be affected by: (a) any amendment or modification of the Loan Documents; or (b) any extensions of time for performance under the Loan Documents, whether prior to or after maturity; or (c) the release of any collateral securing the Loan, or the release (by operation of law or otherwise) of Borrower or any other indemnitor from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents (whether such amendments, modifications, extensions or releases are made with or without notice to Indemnitor); or (d) the failure to give Indemnitor any notices of acceptance, default or otherwise; or (e) any other indemnity now or hereafter executed by any other person in connection with the Loan; or (f) any rights, powers or privileges Lender may now or hereafter have against any person, entity or collateral; or (g) any assignment for the benefit of creditors by Borrower or, if Borrower is a partnership, any general partner of Borrower; or (h) any appointment of a receiver, liquidator or trustee for Borrower or, if Borrower is a partnership, any general partner of Borrower or for any of the properties of Borrower; or (i) any filing of a petition by or against Borrower or, if Borrower is a partnership, any general partner of Borrower, for relief pursuant to the Federal Bankruptcy Code or any similar statute; or (j) the institution of any proceedings for the dissolution or liquidation of Borrower or, if Borrower is a partnership, any general partner of Borrower; or (k) any relief or discharge granted Borrower under the Federal Bankruptcy Code or any other debtor relief laws (whether statutory, common law, case law or otherwise). Under no circumstances shall any payment received by Lender, from Borrower or otherwise, which is returned by Lender by reason of the avoidance powers granted pursuant to any federal or state bankruptcy or similar law or for any other reason, regardless of whether Lender contested the order requiring the return of such payment, result in any reduction of Indemnitor's liability hereunder. Indemnitor waives any right or claim of right to cause a marshalling of Borrower's assets or to cause Lender to proceed at any time or in any particular order against Borrower, Indemnitor, any other person or entity and/or any collateral securing the Loan. To the extent allowed by

-2-

Case 3:16-cv-00498-GCM    Document 1-1    Filed 06/29/16    Page 32 of 33

applicable law, Indemnitor expressly waives and relinquishes all defenses, counterclaims, rights and remedies now or hereafter accorded by applicable law to indemnitors, guarantors or sureties, including, without limitation, those arising out of or related to the following: (I) any extension of time for payment; (II) notice of acceptance of this Indemnity by Lender and any and all notices and demands of every kind which may be required to be given by any statute, rule or law; (III) any defense, right of offset or other claim which Indemnitor may have against Borrower or which Indemnitor or Borrower may have against Lender or the holder of the Note; (IV) presentment for payment, demand for payment, notice of nonpayment or dishonor, protest and notice of protest, diligence in collection and any and all formalities which otherwise might be legally required to charge Indemnitor with liability; (V) any failure by Lender to inform Indemnitor of any facts Lender may now or hereafter know about Borrower, the Mortgaged Property, the Loan or the transactions contemplated by the Loan Documents, it being understood and agreed that Lender has no duty so to inform; (VI) any failure by Lender to perfect or continue the perfection of any lien, security interest or similar rights against any of the Mortgaged Property; and (VII) all rights of redemption, homestead, dower, and other rights or exemptions of every kind, whether under common law or by statute.

     5.    <u>Financial Reports</u>.   All of the financial statements and information delivered to Lender in connection with the Loan are true and correct in all respects, and unless otherwise set forth in the certificate attached thereto, fairly present Indemnitor's financial condition as of the dates thereof; and no adverse change has occurred in Indemnitor's financial condition reflected in such financial statements since the date thereof. Indemnitor agrees to deliver, or cause to be delivered to Lender any and all future financial statements or other financial information required by the Security Instrument or any other Loan Document. Indemnitor has disclosed to Lender all events, conditions, and facts known to Indemnitor which are likely to have an adverse effect on the financial condition of Indemnitor. No representation or warranty by Indemnitor contained herein, nor any schedule, certificate or other document furnished by Indemnitor to Lender in connection with this Indemnity or the Loan contains any misstatement of fact or omits to state any fact necessary to make the statements contained therein not misleading.

     6.    <u>No Waiver by Lender</u>.   No delay on Lender's part in exercising any right, power or privilege under any of the Loan Documents, this Indemnity or any other document executed by Indemnitor in connection with the Loan shall operate as a waiver of any such right, power or privilege.

     7.    <u>Additional Waivers</u>.   Indemnitor waives any defense to its obligations hereunder based on: (a) the claim that the Loan Documents were not duly authorized and executed by Borrower or are not legal, valid and binding instruments, enforceable against Borrower in accordance with their respective terms; or (b) an avoidance action.

     8.    <u>Rights of Action</u>.   Lender shall have the right to join Borrower and/or Indemnitor in any action or proceeding commenced by Lender pursuant to the rights, powers and privileges Lender now or hereafter may possess under this Indemnity or, at Lender's option, Lender may commence any action or proceeding directly against Indemnitor without joining Borrower or anyone else in such action or proceeding. In the event any such action or proceeding arising on, under, out of or by reason of or relating in any way to this Indemnity or the interpretation, breach or enforcement thereof is brought against Indemnitor, service of process may be made on Indemnitor by certified mail, return receipt requested, at the address set forth herein or such other address as Lender is notified of by notice similarly sent.

     9.    <u>Costs and Expenses</u>.   If: (a) this Indemnity is placed in the hands of an attorney for collection of any payment due hereunder or is collected through any legal proceeding; (b) an attorney is retained to represent Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Indemnity or any other Loan Document; (c) an attorney is

4853564.6